IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  10-cv-01899-RBJ-KLM

JEFF BENTON, individually, and
ZOO FANS, INC., a Colorado corporation,

      Plaintiffs/Counterclaim Defendants,

v.

AVEDON ENGINEERING, INC., a Colorado corporation,
AIRIUS IP HOLDINGS, LLC, a Colorado limited liability company, and
AIRIUS, LLC, a Colorado limited liability company,

      Defendants/Counterclaimants/Third-Party Plaintiffs,

v.

WILLIAM F. BUELL, JR., an individual,
HUNTERS GREEN MARKETING, INC., a Kentucky corporation, d/b/a Buell and Buell, and
CORY R. COCHRAN, an individual,

      Third-Party Defendants.

_____

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

This matter is before the Court on **Plaintiffs' and Third-Party Defendant Cochran's Motion for Partial Summary Judgment** [Docket No. 128; Filed February 29, 2012] (the "Motion").   Defendants/Counterclaimants/Third-Party Plaintiffs Avedon Engineering, Inc., Airius IP Holdings, LLC, and Airius LLC (the "Avedon Defendants" or "Avedon") submitted a Response in opposition to the Motion on March 26, 2012 [#142], and Plaintiffs and Third-Party Defendant Cochran (the "Plaintiffs") filed a Reply on April 9, 2012 [#154].  The Motion is ripe and referred to this Court for recommendation [#156].  The Court

has reviewed the Motion, the briefing, the case record, and the applicable law, and is fully advised in the premises.   For the reasons set forth below, the Court respectfully recommends that the Motion be **GRANTED IN PART and DENIED IN PART**.  The Court recommends that summary judgment be entered in favor of Plaintiffs and Third-Party Defendant Cochran as to the Avedon Defendants' First, Second, Sixth, and Seventh Counterclaims on the basis of Colorado's economic loss rule.   The Court further recommends that the Motion be denied as to the Third, Eighth, Ninth, Tenth, Eleventh, and Twelfth Counterclaims.  The Fourth and Fifth Counterclaims are not at issue in the Motion.

## I.  Summary of the Case

This case arises from a failed business relationship regarding air destratification fans.  Plaintiff Jeffrey Benton ("Mr. Benton") is the owner and founder of Plaintiff Zoo Fans, Inc. ("Zoo Fans"), which manufactures and sells the Zoo Fan, an air destratification fan used to circulate air in large buildings.  *Sched. Ord.*, [#77] at 10, 2.  The Avedon Defendants manufacture and sell a competing air destratification fan called the Air Pear. *Id.* at 2.  The Avedon Defendants are owned and operated by Mr. Ray Avedon.  *Id.* at 10. Plaintiffs initiated this declaratory judgment action on August 9, 2010, in response to a cease-and-desist letter sent by Avedon.  *See* [#1].

Third-Party Defendant Cory Cochran ("Mr. Cochran") is the managing director for operations at Zoo Fans, Inc.  *Sched. Ord.*, [#77] at 10.  Third-Party Defendant William Buell ("Mr. Buell") is an owner of a marketing company, Third-Party Defendant Hunters Green Marketing, Inc. ("Hunters Green").  *Id.*  Previously, Mr. Buell worked for a company called Big Ass Fans, located in Lexington, Kentucky.  *Id.* at 11.

Broadly, the Avedon Defendants allege that the Plaintiffs and Third-Party

Defendants (also collectively referred to as the "opposing parties") schemed to misappropriate information related to the Air Pear and to infringe on Avedon's product design, for the purpose of starting Zoo Fans as a competing company. *Id.* at 4.  The Avedon Defendants allege that Mr. Benton previously attempted to gain an ownership interest in Avedon and was not successful, whereupon he instead entered into an exclusive-dealing agreement with Avedon under the guise of securing other investors or buyers for the Avedon Defendants. *Id.* at 4, 5.  The Avedon Defendants assert that confidential information was disclosed to Mr. Benton in the course of his performance of the contract, in exchange for his promise to keep the proprietary information confidential. *Id.*

Additionally, Avedon entered into a marketing agreement and related confidentiality agreement with Mr. Buell and Hunters Green, and Mr. Avedon gave these parties access to proprietary information. *Id.*  Mr. Buell allegedly promised the Avedon Defendants that he and Hunters Green would not provide marketing services to any of Avedon's competitors. *Id.*

More specifically, the Avedon Defendants contend that beginning in March 2009, Mr. Benton and Mr. Cochran began a scheme to steal Avedon's trade secret information for the purpose of starting up Zoo Fans. *Id.*  Avedon attests that Mr. Benton never secured or attempted to secure other investors in the company, despite his agreement to do so. *Id.* at 6.  Avedon alleges that Mr. Buell began helping Mr. Benton and Mr. Cochran in October 2009. *Id.*  Avedon discovered the formation of Zoo Fans in March 2010, as a result of inquiries to Avedon regarding the similarities and differences between a Zoo Fan and an Air Pear. *Id.* at 6-7.  Avedon avers that representatives of Zoo Fans made false statements

3

about the Air Pear to gain customers, and that the Zoo Fan is actually a knock-off of the Air Pear. *Id.* at 7.

On January 4, 2011, the Court permitted Plaintiffs leave to file a First Amended Complaint, which is the operative pleading. [#69]. Plaintiffs bring five claims in the First Amended Complaint, including four claims for declaratory judgment: that Zoo Fans did not infringe Avedon's product patent, that Zoo Fans did not engage in unfair competition, that Mr. Benton did not violate the confidentiality agreement with Avedon, and that the Plaintiffs did not misappropriate Avedon's trade secrets. *See id.* The fifth claim alleges that Defendants violated the Lanham Act, 15 U.S.C. § 1125(a)(1)(B). *See id.*

The Avedon Defendants responded to the First Amended Complaint with an Answer and Counterclaims and Third-Party Complaint. *See* [#70]. Avedon presents twelve counterclaims/third-party claims as follows: 1) fraud against Mr. Benton; 2) aiding and abetting fraud against Zoo Fans, Mr. Cochran, and Mr. Buell; 3) trade secret misappropriation against all Plaintiffs and Third-Party Defendants; 4) breach of confidentiality agreements against Mr. Benton, Mr. Buell, and Hunters Green; 5) breach of services agreements against Mr. Benton, Mr. Buell, and Hunters Green; 6) breach of fiduciary duty against Mr. Benton, Mr. Buell, and Hunters Green; 7) aiding and abetting breach of fiduciary duty against Zoo Fans and Mr. Cochran; 8) unjust enrichment/ imposition of constructive trust against all Plaintiffs and Third-Party Defendants; 9) violation of the Colorado Consumer Protection Act ("CCPA") against all Plaintiffs and Third-Party Defendants; 10) common law unfair competition against all Plaintiffs and Third-Party Defendants; 11) civil conspiracy against all Plaintiffs and Third-Party Defendants; and 12) design patent infringement against all Plaintiffs and Third-Party Defendants. *See id.*

4

The instant Motion concerns all but two of the Avedon Defendants' counterclaims/third-party claims (collectively, "counterclaims"). *See* [#128]. Plaintiffs and Mr. Cochran request summary judgment in their favor as to Defendants' First, Second, Third, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, and Twelfth Counterclaims. *Id.* They do not request summary judgment as to Defendants' Fourth and Fifth Counterclaims, which concern alleged breaches of the confidentiality and services agreements by Mr. Benton, Mr. Buell, and Hunters Green.

## II.  Standard of Review

The purpose of a motion for summary judgment pursuant to Fed. R. Civ. P. 56 is to assess whether trial is necessary. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Under Fed. R. Civ. P. 56(c), summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." An issue is genuine if the evidence is such that a reasonable jury could resolve the issue in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it might affect the outcome of the case under the governing substantive law. *Id.*

The burden is on the movant to show the absence of a genuine issue of material fact. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 323). When the movant does not bear the ultimate burden of persuasion at trial, the "movant may make its prima facie demonstration [of the absence of a genuine issue of material fact] simply by pointing out to the [C]ourt a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Id.* at 671. If the movant

carries the initial burden of making a prima facie showing of a lack of evidence, the burden shifts to the nonmovant to put forth sufficient evidence for each essential element of his claim such that a reasonable jury could find in his favor. *See Anderson*, 477 U.S. at 248; *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999).

The nonmovant must go beyond the allegations and denials of his pleadings and provide admissible evidence, which the Court views in the light most favorable to him. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995) (citing *Celotex*, 477 U.S. at 324). Conclusory statements based merely on conjecture, speculation, or subjective belief are not competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). The nonmoving party's evidence must be more than "mere reargument of [his] case or a denial of an opponent's allegation" or it will be disregarded. *See* 10B Charles Alan Wright, et al., Federal Practice and Procedure § 2738 at 356 (3d ed.1998).

### III.  Statement of Undisputed Material Facts

The below Statement of Undisputed Material Facts ("Facts") is derived from the briefing on the Motion. The Court states the facts as presented by Plaintiffs and Mr. Cochran that are explicitly undisputed by Avedon, and vice versa. Regarding the disputed facts, those which the Court accepts or modifies are noted as needed. Based on the record before the Court, the Court recommends that the following facts be accepted as material and undisputed:

1. Avedon manufactures and sells an air destratification fan called the Air Pear. *Sched. Ord.*, [#77] at 2.

6

2. Beginning in 2006, Mr. Benton and Mr. Avedon discussed a potential investment by Mr. Benton in Avedon.  *Countercl.*, [#70] at ¶¶ 23, 25; *Answer*, [#79] at ¶¶ 23, 25.

3. Mr. Benton and Avedon entered into a Confidentiality Agreement on January 27, 2006, which governed the disclosure of any confidential information by Avedon to Mr. Benton.  *Confidentiality Agreement*, [#14-1].

4. Mr. Benton and Mr. Avedon could not agree on the terms of an investment by Mr. Benton in Avedon and ceased negotiations in August 2007.  *Countercl.*, [#70] at ¶ 28; *Answer*, [#79] at ¶ 28.

5. Mr. Buell assisted Mr. Avedon in marketing Avedon's products, and came up with the name "Air Pear."  *Buell Depo. Tr.*, [#144-10] at 3.

6. Mr. Buell signed a Non-Disclosure Agreement between himself and Avedon, effective July 1, 2008, regarding disclosure of Avedon's "business, financial and technical information" to Mr. Buell.  *Agreement*, [#144-9].

7. On November 13, 2008, Mr. Buell sent an email to Donald Welshon outlining his concerns regarding a proposed consulting agreement between himself and Avedon.  [#144-8] at 1-3.  Mr. Buell agreed that as of November 13, 2008, he had no plans "except to devote all efforts full-time to [Avedon]."  *Buell Depo. Tr.*, [#144-10] at 3.

8. Negotiations between Mr. Benton and Mr. Avedon started up again in November 2008.  *Countercl.*, [#70] at ¶ 34; *Answer*, [#79] at ¶ 34.

9. Mr. Benton and Avedon executed an exclusive-dealing letter agreement related to exploration of a potential business transaction on January 27 and February 4, 2009, which included a provision that Mr. Benton would commence preparation of a Business Plan for Defendant Airius LLC, with the purpose of attracting partners to finance Airius LLC.

*Letter Agreement*, [#14-2].

10. Mr. Benton and Avedon executed a Non-Disclosure Agreement, effective March 1, 2009, regarding disclosure of Avedon's "business, financial and technical information" to Mr. Benton. *Agreement*, [#1-2].

11. In May 2009, Mr. Buell told Mr. Benton that he believed an opportunity existed to create a business that would compete with Avedon. *Id.*; *Buell Depo. Tr.*, [#144-10] at 5-6.

12. Mr. Buell brought a sample of the Air Pear to a meeting with Mr. Benton and Mr. Nelson, an engineer, in June 2009.[1] *Benton Depo. Tr.*, [#144-2] at 11.

13. In early August 2009, Mr. Benton met with Priority Designs to explore hiring Priority Designs to develop a fan. *Id.* at 18-19. Mr. Buell brought a sample of the Air Pear to the meeting with Mr. Benton and Priority Designs. *Id.* at 19.

14. In October 2009, Mr. Benton notified Mr. Avedon that he no longer wanted to continue their business relationship. *Mot.*, [#128] at 5; *Resp.*, [#142] at 5.

15. On October 27, 2009, Mr. Buell submitted a "Final Invoice" to Airius for compensation for his marketing services. *Id.* at 4.

16. Until December 2007, Avedon published a partial list of its customers on its website. *Avedon Depo. Tr.*, [#130-1] at 14.

17. Charles Canby, an Avedon employee, prepared a list of trade shows for Avedon each year. *Canby Depo. Tr.*, [#128-10] at 3. The trade show list for "the rest of 2008 and 2009" was published on Avedon's website in or about October 2008. *Id.* at 5-6.

---

[1] Mr. Buell refers to "a sample of an Airius fan" in the deposition transcript. Defendant Avedon Engineering, Inc. manufactures the Air Pear, Defendant Airius, LLC markets and sells the Air Pear, and Defendant Airius IP Holdings, LLC owns the design patent for the Air Pear. *Sched. Ord.*, [#77] at 4. Thus, the Court utilizes the term "Air Pear" interchangeably with "Airius fan."

18. In a conversation with Mr. Canby before Fall 2009, Mr. Benton talked about his idea to develop a company that manufactured and sold air destratification fans. *Id.* at 3-4. Mr. Benton and Mr. Canby discussed the potential for Mr. Canby to be employed by Mr. Benton in a new venture. *Id.* at 7.

19. Mr. Benton founded and owns Zoo Fans, Inc., which was incorporated with the Colorado Secretary of State on February 9, 2010. *Sched. Ord.*, [#77] at 10; *Mot.*, [#128] at 6; *Resp.*, [#143] at 4, ¶ 8.

20. Zoo Fans, Inc. sells the Zoo Fan, which, like the Air Pear, is an air destratification fan. *See id.*

21. Mr. Avedon first learned of Zoo Fans in March 2010, when a fan-industry colleague contacted him to ask if the Zoo Fan was an Avedon product. *Marla Helms Aff.*, [#142-33] at 3; *see also Email dated March 11, 2010*, [#142-34].

22. Ms. Helms was the marketing director for Macro Air Technologies, Inc. and attests that she is "very familiar with Avedon's Air Pear and the destratification industry." *Helms Aff.*, [#142-33] at 3. Ms. Helms explains that she performed an internet search in March 2010 for fans from a tradeshow and the Zoo Fan product was a search result. *Id.* Ms. Helms avers that the Zoo Fan "looked nearly identical and confusingly similar to Avedon's Air Pear." *Id.*

23. Mr. Benton sent an email to Mr. Avedon on March 12, 2010, stating that he went "into a venture with some other people" and "launched at [a tradeshow] in Orlando." [#142-35] at 2. Mr. Benton wrote, "Ray Kroc didn't invent hamburgers, neither did Burger King or Wendy's, and they all did just fine." *Id.*

24. In an email dated March 11, 2010 from Mr. Benton to Mr. Buell, Mr. Cochran,

and Mike Johnson, Mr. Benton admitted that the photos of installations of the Zoo Fan displayed on Zoo Fans' website were simulated.  [#142-34].

25. Mr. Buell confirmed that the photos on the website were "photo-shopped," and that there were no installed Zoo Fan products until the third quarter of 2010.  *Buell Depo. Tr.*, [#144-10] at 11-12.  The simulated photos on the website suggested that Zoo Fan products were installed for six or seven months before a Zoo Fan product was actually installed.  *Id.* at 12.

26. Mr. Cochran confirmed that at the tradeshow in Florida at the end of January 2010, he and Mr. Benton presented a laser-cut model of an air destratification fan, and that they did not have any actual product at the tradeshow.  *Cochran Depo. Tr.*, [#149-1] at 4; *Benton Depo. Tr.*, [#144-2] at 22.

27.  Mr. Benton believes that approximately 20,000 people attended the Florida tradeshow.  *Benton Depo. Tr.*, [#144-2] at 23.

28. At a tradeshow in Dallas, Texas in August 2010, the Zoo Fans' booth presented a physical product and photos of the product installed at numerous locations.  *Mark E. Hanna Aff.*, [#142-33] at 1.  The Zoo Fans marketing materials at the booth did not indicate that the product was unavailable for sale, delivery, and installation.  *Id.* at 2.

29. Mr. Mark E. Hanna attended the August 2010 tradeshow in Dallas, and states that at that tradeshow, Zoo Fans representatives told him that "Zoo Fans had an operating product ready to sell, deliver, and install."  *Id.*  The representatives further told Mr. Hanna that the photos of the installed product were actual installations.  *Id.*

30. The first sale of a Zoo Fan product occurred in October 2010.  *Benton Depo. Tr.*, [#144-2] at 22.

31.  At a tradeshow in Chicago, Illinois on October 11, 2011, a tradeshow attendee, Mr. Hugh Jones, visited the Zoo Fans Booth.  *Hugh Jones Aff.*, [#142-33] at 6.  Mr. Jones uses the Air Pear at his home and recommends the Air Pear to his customers.  *Id.*  Mr. Jones explains that he thought that the Zoo Fans booth was Avedon's booth, and was "surprised to learn that Zoo Fans was actually a competitor to Avedon."  *Id.*  Mr. Jones is a "professional familiar with the benefits of air destratification."  *Id.*  Mr. Jones believed that the Zoo Fan was the same product as the Air Pear.  *Id.*

32.  Mr. Jack Matzer, Avedon's former Midwest sales representative, met with Mr. Benton, Mr. Cochran, Mr. Buell, and Mr. Johnson in April 2010.  *Matzer Depo. Tr.*, [#150-1] at 4-5.  Mr. Matzer provided Mr. Benton and Mr. Johnson with proposal logs that he prepared in exactly the same way that he prepared proposal logs for Avedon.  *Id.* at 27.  Mr. Matzer contacted energy services groups that were Avedon customers on behalf of Zoo Fans.  *Id.* at 28.

33.  Plaintiffs produced records during discovery in this litigation that Mr. Benton obtained pursuant to the confidentiality agreement he executed with Avedon, including documents representing Avedon's manufacturing costs and margins.  *See* [#142-40]; *Benton Depo. Tr.*, [#144-2] at 9.

34.  Mr. Buell testified that, after October 2009, he saw Mr. Benton working with and using Avedon financial spreadsheets.  *Buell Depo. Tr.*, [#144-10] at 17.

35.  Mr. Avedon holds a United States Design Patent as to the Air Pear, Patent No. D514,688 ("the '688 patent"), dated February 7, 2006.  *Patent*, [#128-5].

36.  Mr. Benton, Mr. Buell, and Mr. Brian M. Johnson hold a United States Design Patent as to the Zoo Fan, Patent No. D631,148 ("the '148 patent"), dated January 18, 2011.

*Patent*, [#128-8].

37. The '148 patent includes the '688 patent and another patent held by Avedon as prior art. *Id.* at 1.

## IV. Analysis

### A.     Economic Loss Rule: Counterclaims One, Two, Six, and Seven

The Court first addresses the parties' arguments regarding Colorado's economic loss rule. Plaintiffs argue that Avedon's counterclaims alleging fraud, breach of fiduciary duty, aiding and abetting the same, and civil conspiracy are barred by the economic loss rule. *See* [#128] at 27; [#154] at 19. Avedon opposes this argument, and asserts that the duties implicated by the relevant counterclaims are separate from the duties memorialized by the various contracts between the parties. *See* [#142] at 33-34. The Court agrees with Plaintiffs in large part (with the exception of the Eleventh Counterclaim for civil conspiracy, addressed immediately following this section), and recommends that summary judgment be entered in their favor as to the Avedon Defendants' First, Second, Sixth, and Seventh Counterclaims on the basis of Colorado's economic loss rule.

Whether Colorado's economic loss rule bars a claim is a question of law. *Standard Bank, PLC v. Runge, Inc.*, 443 F. App'x 347, 349 (10th Cir. 2011). Pursuant to Colorado law, the economic loss rule provides that "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." *Standard Bank*, 443 F. App'x at 349-50. The stated purpose of the economic loss rule is three-fold: "(1) to maintain a distinction between contract and tort law; (2) to enforce expectancy interests of the parties so that they can reliably allocate risks and costs during their bargaining; and (3) to

encourage the parties to build cost considerations into the contract because they will not be able to recover economic damages in tort." *Id.* at 351 (citing *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 72 (Colo. 2004)).   The economic loss rule may apply even in the absence of an explicit contract, if "the claimant seeks to remedy only an economic loss that arises from interrelated contracts."   *Id.* at 350.

In determining whether the economic loss rule is applicable, the Court must focus "on the source of the duty alleged to have been breached."   *Id.*   A duty arising in tort must be "sufficiently independent of the contract to preclude application of the economic loss rule."   *Id.* at 351.   A tort duty that is sufficiently independent of the contract at issue must meet two conditions: "[f]irst, the duty must arise from a source other than the relevant contract[;] [s]econd, the duty must not be a duty also imposed by the contract."   *Registry Sys. Int'l, Ltd. v. Hamm*, No. 08-cv-00495-PAB-MJW, 2010 WL 326327, at *10 (D. Colo. Jan. 20, 2010) (citing *Haynes Trane Serv. Agency, Inc. v. Am. Standard, Inc.*, 573 F.3d 947, 962 (10th Cir. 2009)).   Broadly, "[t]ort obligations generally arise from duties imposed by law . . . without regard to any agreement or contract," and "[c]ontract obligations, on the other hand, 'arise from promises made between parties [to] allocate risks and costs during bargaining.'" *Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1162 (10th Cir. 2008) (citing *Town of Alma v. Azco Constr., Inc.*, 10 P.3d 1256, 1262 (Colo. 2000)).

The Court first determines "whether the duties between these commercial parties were governed by a set of interrelated contracts."   *Standard Bank*, 443 F. App'x at 351. Next, the Court must identify the source of the duty in dispute.   *Id.* at 352.   To do so, the Court evaluates: "(1) whether the relief sought in negligence is the same as the contractual relief; (2) whether there is a recognized common law duty of care in negligence; and (3)

whether the negligence duty differs in any way from the contractual duty." *Id.* (citing *BRW, Inc.*, 99 P.3d at 74).  As applied to this matter, the above rules specify that if the owed duty of care was memorialized in the relevant contracts, the contested duty is not sufficiently independent of the contracts, and the economic loss rule precludes the Avedon Defendants' claims. *See id.*  The Court addresses the relevant counterclaims in turn.

### 1.    Fraud against Mr. Benton (Counterclaim One)

In Counterclaim One, Avedon contends that Mr. Benton never intended to find investors for Avedon, despite his execution of the exclusive-dealing letter agreement dated February 4, 2009.  [#70] at 25.  Avedon speculates that Mr. Benton's motivation in executing the exclusive-dealing agreement was to "to tie up Avedon, while Mr. Benton, Mr. Cochran, and Mr. Buell established and operated the competing company called Zoo Fans." *Id.* at 26.  Avedon alleges that Mr. Benton knew that he was making a false representation of his intent, and further intended that Avedon should rely on the false representation to its detriment. *Id.* at 26-27.  Avedon asserts that, as a result, it "suffered financial damages, including lost purchase and investment opportunities." *Id.* at 27.

Counterclaim Five states a breach of contract counterclaim arising from the same exclusive-dealing letter agreement at issue in Counterclaim One.  In Counterclaim Five, Avedon recites the same underlying allegations and asserts a nearly identical request for relief as stated in Counterclaim One. *See id.* at 30-31.

As indicated above, in determining whether the economic loss rule is applicable, the Court must focus on the source of the duty alleged to have been breached.  In sum, the allegations of Counterclaim One aver that Mr. Benton intentionally made a "false misrepresentation that [he] intended to attempt to broker an investor agreement when Mr.

Avedon executed [the] January 27, 2009 exclusive-dealing agreement."   [#70] at 26.   In response, Avedon's only argument against application of the economic loss rule to its fraud counterclaim is that the "economic-loss rule [is] inapplicable to [a] fraud-in-the-inducement claim."  [#142] at 34.

Contrary to Avedon's argument, the Colorado Court of Appeals has held that the Colorado Supreme Court "did not articulate any sweeping principle exempting post-contractual fraud claims from the ambit of the economic loss rule." *Hamon Contractors, Inc. v. Carter & Burgess, Inc.*, 229 P.3d 282, 291 (Colo. App. 2009). Moreover, Colorado's economic loss rule has been applied to fraud claims in this District. *See, e.g., Oilman Int'l, FZCO v. Neer*, No. 10-cv-02810-PAB-BNB, 2012 WL 1059987, at *3 (D. Colo. Mar. 29, 2012) (evaluating application of economic loss rule to fraudulent misrepresentation, fraudulent concealment, and civil theft claims); *Western Convenience Stores, Inc. v. Thielen*, No. 09-cv-02626-LTB-BNB, 2011 WL 866755, at *6 (D. Colo. Mar. 14, 2011) ("the economic loss rule bars the fraud/negligent misrepresentation claim in this case as a matter of law"); *Tara Woods Ltd. P'ship v. Fannie Mae*, 731 F. Supp. 2d 1103, 1114 n.7 (D. Colo. 2010) (the economic loss rule "provides that relief in tort - *i.e.* fraud - does not lie where the party's injury derives solely from breach of the express or implied duties arising in contract").

"A promise concerning a future act, when coupled with a present intention not to fulfill that promise, can be actionable fraud." *H & H Distrib., Inc. v. BBC Int'l, Inc.*, 812 P.2d 659, 662 (Colo. App.1990).  However, "[a] claim for the tort of fraud cannot be predicated upon the mere nonperformance of a promise or contractual obligation or upon the failure to fulfill an agreement to do something at a future time." *Id.*

15

Here, the Court recognizes a "common law duty of reasonable care in communicating information in a business transaction," or a duty to refrain from making false representations when negotiating a business contract, but "the breach of that duty as alleged in this case does not differ in any way from the contractual duty." *See Western Convenience Stores*, 2011 WL 866755 at *6. Mr. Benton, pursuant to the exclusive-dealing letter agreement, had a contractual duty to pursue investment partners to invest in or purchase Avedon, and Avedon contends that Mr. Benton never intended to fulfill that contractual duty and in fact, failed to perform the contractual duty. Moreover, the relief sought in Avedon's fraud counterclaim is the same as the contractual relief sought: money damages intended to compensate for alleged "lost purchase and investment opportunities." *See* [#70] at 27, 30-31. In light of the same requested relief, and that the duties complained of in Avedon's fraud counterclaim (First) are identical to those complained of in Avedon's contract counterclaim (Fifth), the Court concludes that the fraud counterclaim - based on the alleged misrepresentation that Mr. Benton intended to find investment partners for Avedon - "arises from a contractual duty that does not exist independent of the contract." *Id.* (citing *H & H Distrib.*, 912 P.2d at 662); *see also Registry Sys. Int'l*, 2010 WL 326327 at *10.

Stated another way, Avedon's fraud counterclaim arises out of Mr. Benton's "alleged failure to carry out the contract's duties in good faith." *Tara Woods Ltd. P'ship*, 731 F. Supp. 2d at 1114 n.7. Avedon's fraud counterclaim therefore "is precluded by available contractual remedies," and the economic loss rule applies. *Id.*; *see also OTO Software, Inc. v. Highwall Technologies, LLC*, No. 08-cv-01897-PAB-CBS, 2011 WL 3236049, at *13 (D. Colo. July 5, 2011) (applying Colorado's economic loss rule to preclude a claim of fraud,

16

as the defendants' duty to provide truthful information arose from obligations stated in a contract entered into by the parties, and the alleged fraud did "not concern a matter . . . that could be considered extrinsic to the parties' contract.").

The policy behind application of the economic loss rule recognizes that "commercially sophisticated parties" negotiate and bargain for an "allocation of risks, duties, and remedies" in the formation of their business contracts, and that therefore the parties' agreement should provide the platform for legal relief. *See, e.g., Standard Bank*, 443 F. App'x at 351 (citing *BRW*, 99 P.3d at 73). It is apparent that Avedon is displeased by how the other parties to this lawsuit carried out their contractual obligations; however, those obligations were negotiated and bargained for by commercially sophisticated individuals, and the consequence for contractual nonperformance is relief based on contract principles, not tort principles. Notably, the exclusive-dealing letter agreement is markedly one-sided; the contract provides remedies for Mr. Benton if Avedon does not perform, but does not contain remedies for Avedon in the case of nonperformance by Mr. Benton. *See* [#14-2]. Avedon may not now attempt to recover damages in tort based on its failure to allocate risks and costs during its negotiations of the contracts at issue. *See BRW*, 99 P.3d at 72. Therefore, the Court recommends that summary judgment be entered in favor of Plaintiffs and Mr. Cochran as to the Avedon Defendants' Counterclaim One (and as further described below, Counterclaims Two, Six, Seven, and Eleven), on the basis of Colorado's economic loss rule.

### 2.    Breach of Fiduciary Duty Against Mr. Benton, Mr. Buell, and Hunters Green (Counterclaim Six)

In Counterclaim Six, the Avedon Defendants contend that Mr. Benton, Mr. Buell, and Hunters Green "were entrusted with agency roles with Avedon." [#70] at 32. Mr. Benton

allegedly acted as Avedon's agent in relation to his obligations stated in the exclusive-dealing letter agreement, and Mr. Buell and Hunters Green allegedly acted as Avedon's agents via the obligations stated in the marketing agreement executed between these parties. *Id.* In light of these "agency roles," as well as a "relationship of trust, confidence, and reliance," Avedon asserts that it is owed fiduciary duties by Mr. Benton, Mr. Buell, and Hunters Green. *Id.* Avedon avers that Mr. Benton, Mr. Buell, and Hunters Green breached their fiduciary duties by abusing "their agency role" and by stealing Avedon's proprietary information, for the purpose of establishing Zoo Fans. *Id.* As a remedy, Avedon seeks money damages as compensation for "lost profits and lost investment and purchase opportunities." *Id.*

Plaintiffs present two primary arguments in support of their request for summary judgment as to this counterclaim. First, Plaintiffs assert that Avedon cannot establish that Mr. Benton, Mr. Buell, and Hunters Green owed Avedon a fiduciary duty, because "the alleged fiduciary relationship is premised upon a conventional business relationship." [#128] at 12. Second, Plaintiffs reiterate their contention that the economic loss rule preludes this counterclaim because "the purported evidence of a breach of fiduciary duty would constitute a breach of the parties' contract's express or implied terms." *Id.* at 13.

In response, Avedon emphasizes its position that a fiduciary relationship was created between it and Mr. Benton, Mr. Buell and Hunters Green, because of the "special agency role of trust and confidence" undertaken by these parties concerning the Avedon Defendants. [#142] at 24. Avedon attempts to clarify the duties giving rise to this counterclaim as distinct from any contractual duty, based on the allegation that Mr. Benton's "breach of fiduciary duty involved his secret competition and misuse of Avedon's

18

confidential information for his own benefit."  *Id.* at 34.

Assuming *arguendo* that a fiduciary relationship exists (which the Court does only for the purpose of this Recommendation), legal authority relied on by the Avedon Defendants weighs against their challenge to the application of Colorado's economic loss rule.  Avedon cites to *A Good Time Rental, LLC v. First American Title Agency, Inc.*, 259 P.3d 534 (Colo. App. 2011) in its Response.  *Id.*  In *Good Time Rental*, the Colorado Court of Appeals adjudicated a dispute between a closing agent and the closing agent's client. The *Good Time Rental* court noted that a fiduciary relationship had been recognized as existing between a closing agent and a client, but disagreed "that a fiduciary duty between contracting parties necessarily creates a special relationship which effectively trumps the economic loss rule."  259 P.3d at 540.  The court emphasized that "not every fiduciary relationship implicates a risk of damages for which contract law cannot provide a remedy." *Id.*  The *Good Time Rental* court found that "any fiduciary relationship arose from a contract between commercial parties, the object of which was a purely economic benefit."  *Id.*  Thus, the contractual duties between the parties could not serve as grounds for a tort claim that, if successful, would award the prevailing party "additional compensation for [the] alleged failure to perform that same contractual obligation."  *Id.* (collecting federal district court cases which "reached a similar conclusion").

The same holds true in this matter.  The alleged "agency" relationships arose from certain contractual duties described by Avedon; that is, Mr. Benton's duty to develop a business plan and attract investors, Mr. Buell's and Hunters Green's duty to develop and execute a marketing plan, and the duty of those parties to maintain Avedon's proprietary information as confidential.  *See* [#70] at 32, ¶ 101.  These duties are directly tied to the

contractual duties stated in the exclusive-dealing letter agreement, confidentiality/non-disclosure agreements and the alleged marketing agreement, and are not reasonably (or feasibly) separate from them.

Avedon's argument that the breach of fiduciary duty at issue arose from Mr. Benton's "secret competition" is unavailing.  *See* [#142] at 34.  Although the duty to refrain from "secret competition" is not necessarily a contractual obligation in this matter (as further explained below in the section regarding Avedon's counterclaim for civil conspiracy), Avedon does not present legal authority indicating that a duty not to unfairly compete implicates a fiduciary relationship.  Here, similar to *Good Time Rental*, the alleged agency roles implicating a fiduciary relationship arise solely (and are inseparable) from the contractual duties, as described above.   Thus, Avedon's breach of fiduciary duty counterclaim is simply another way of claiming that Mr. Benton, Mr. Buell, and Hunters Green's "fail[ed] to carry out the contract[s'] duties in good faith."  *Tara Woods Ltd. P'ship*, 731 F. Supp. 2d at 1114 n.7.  The Court therefore recommends that summary judgment be entered in favor of Plaintiffs and Mr. Cochran on the Avedon Defendants' Counterclaim Six on the basis of Colorado's economic loss rule.

### 3.    Aiding and Abetting Fraud against Zoo Fans, Mr. Cochran, And Mr. Buell (Counterclaim Two), and Aiding and Abetting Breach of Fiduciary Duty against Zoo Fans and Mr. Cochran (Counterclaim Seven)

"Liability for aiding or abetting a tortious act will be found if the party whom the defendant aids performs a wrongful act that causes an injury, the defendant is generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance, and the defendant knowingly and substantially assists the principal violation."  *Holmes v. Young*, 885 P.2d 305, 308 (Colo. App. 1994).  As described above,

the Court recommends finding that the counterclaims asserting fraud and breach of fiduciary duty are barred by Colorado's economic loss rule as a matter of law, thus there is no "principal violation" which was assisted by Zoo Fans, Mr. Cochran, or Mr. Buell. Therefore, the Court recommends that summary judgment be entered in favor of Plaintiffs and Mr. Cochran as to Avedon's Counterclaims Two and Seven.

## B.    Civil Conspiracy Against All Plaintiffs and Third-Party Defendants (Counterclaim Eleven)

The Avedon Defendants base their civil conspiracy counterclaim on the alleged "illegal and successful scheme to steal Avedon's Air Pear," and as support for this counterclaim, cite alleged breaches of the multiple agreements giving rise to this dispute: "Mr. Benton and Mr. Cochran's operation of ZooFans.com, after Mr. Benton signed Avedon's confidentiality agreement . . . ; Mr. Benton's tying up of Avedon in the January 2009 exclusive-dealing agreement, under the false pretense of securing potential investors . . . ; and Mr. Buell's representation of competitor Zoo Fans while he was under his marketing-services agreement with Avedon." [#70] at 36-37. As a remedy, Avedon seeks money damages as compensation for "lost sales and profits and lost investment and purchase opportunities." *Id.*

Plaintiffs aver that "a party's breach of its own contract does not support a civil conspiracy claim." [#128] at 23 (citations omitted). Additionally, Plaintiffs contend that the economic loss rule precludes the civil conspiracy counterclaim. *Id.* at 28.

In Colorado, a civil conspiracy claim is proved by evidence of the following five elements: "(1) two or more persons, and for this purpose a corporation is a person; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof." *Bressler*

*v. Amer. Fed'n of Human Rights*, 44 F. App'x 303, 341 (10th Cir. 2002) (citation omitted).

In *Sweeney v. Marvin Windows, Inc.*, No. 10-cv-00457-WDM-KMT, 2010 WL 4256195, at *5 (D. Colo. Oct. 20, 2010), a District Judge in this District evaluated a claim of civil conspiracy based on breach of contract, interference with a business advantage, and affirmative acts to restrain competition. The court found that the alleged acts amounted to no more than a breach of the contract in dispute (and did "not violate any other legal duty"), and the civil conspiracy claim was therefore barred by the economic loss rule. *See id.*

Similarly, in *Leonard H. Chanda & Associates, L.P. v. Design Control Committee of Meridian International Business Center*, No. 09-cv-00014-WYD, 2010 WL 3894013, at *8 (D. Colo. Sept. 30, 2010), this District's Chief Judge evaluated a civil conspiracy claim premised on a breached agreement. The court held that the plaintiff "simply found another way" of alleging a breach of contract claim, and did not properly assert an "unlawful [act] that might support a civil conspiracy claim." *Id.* The plaintiff provided no authority to the contrary, and the court found that the plaintiff failed to establish a genuine issue of fact as to the civil conspiracy claim. *Id.*

The case at hand is distinguishable. Although it appears that Mr. Buell contracted to provide services exclusively for the Avedon Defendants,[2] there is no evidence

---

[2]  Notably, the parties have failed to provide the Court with a full copy of the marketing agreement. Avedon provides an email in which Mr. Buell expresses his concerns regarding the marketing agreement, *see* [#144-8], and Mr. Buell addressed the agreement during his deposition, *see* [#144-10] at 3, but as far as the Court can tell, the record does not include a copy of the actual agreement. *See Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1546 (10th Cir. 1995) ("[S]ufficient evidence ... must be identified by reference to a [pleading]. Without a specific reference, 'we will not search the record in an effort to determine whether there exists dormant evidence ....' " (citation omitted)); *SEC v. Thomas*, 965 F.2d 825, 827 (10th Cir. 1992) (noting that Court is not obligated to sift through record to find support for party's case). As a general matter, the Court is reluctant to opine regarding the scope of an agreement's contractual duties without reviewing the actual agreement. In any event, Mr. Buell has not joined the instant Motion, which is submitted only by Plaintiffs and Mr. Cochran.

suggesting that Mr. Benton, Zoo Fans, Inc., or Mr. Cochran were under any contractual obligation of non-competition.   Moreover, the Avedon Defendants base their conspiracy claim on their contention that Plaintiffs and the Third-Party Defendants engaged in multiple "secret meetings" which resulted in a plan to, in effect, misappropriate trade secrets and infringe a valid patent.  [#70] at 36.  To the extent that the opposing parties had obligations not to do so, those obligations were pursuant to law, not contract.  Thus, any duty of the opposing parties to not act in concert to unfairly create a competing company, to steal trade secrets or to infringe a patent arose separately from the contractual duties in dispute.  The economic loss rule therefore does not apply.

Furthermore, the Court finds that genuine issues of material fact exist as to this counterclaim, despite Avedon's deficient Response.   Avedon does not provide legal authority for its contention that the alleged multiple "secret meetings" constitute overt acts for the purpose of a civil conspiracy claim.  *See* [#142] at 31.   However, as further explained below, the Court concludes that summary judgment is inappropriate as to Avedon's counterclaims for trade secret misappropriation and design patent infringement. It logically follows that a reasonable jury could find that these contraventions of the law, if proven, constituted overt unlawful acts taken in furtherance of what appears to be a common effort by the opposing parties to create a competing company.   Therefore, summary judgment is also inappropriate as to this counterclaim, and the Court recommends that the Motion be denied as to Counterclaim Eleven.

## C.   Trade Secret Misappropriation Against All Plaintiffs and Third-Party Defendants (Counterclaim Three)

The Avedon Defendants bring their Third Counterclaim pursuant to Colo. Rev. Stat. §§ 7-74-101, *et seq.*  [#70] at 28.  Avedon asserts that its "confidential marketing strategy,

customer lists, financials, scientific and technical data, design information, and other proprietary information" constitute trade secrets. *Id.* Avedon contends that the opposing parties breached certain confidentiality agreements that they executed with Avedon by stealing Avedon's trade secrets, and that the opposing parties improperly used such confidential information to create Zoo Fans, which is now Avedon's competitor. *Id.* at 29.

Plaintiffs contend that Avedon cannot "provide any evidence of a protectable trade secret or misappropriation of any purported trade secret." [#128] at 14. Plaintiffs aver that the items identified as trade secrets by Mr. Avedon were not confidential "and were well known outside the company." *Id.* at 15 (referring to a list of 2009 trade shows, a customer list, cost information, industry research, and governmental regulations). Because the information was known outside of the company, Plaintiffs believe that Avedon did not take measures to prevent disclosure of the trade secrets, and summary judgment in Plaintiffs' favor is thus appropriate. *Id.* at 16. The Avedon Defendants counter, stating that they have "produced substantial evidence of [Plaintiffs'] trade-secret misappropriation." [#142] at 26.

"Under Colorado law, to prove theft or misappropriation of a trade secret, plaintiff must show: (i) that he or she possessed a valid trade secret, (ii) that the trade secret was disclosed or used without consent, and, (iii) that the defendant knew, or should have known, that the trade secret was acquired by improper means." *Gates Rubber Co. v. Bando Chemical Indus. Ltd.*, 9 F.3d 823, 847 (10th Cir. 1993). "Trade-secret status is a question of fact." *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1129 (10th Cir. 2003); *Saturn Sys., Inc. v. Militare*, 252 P.3d 516, 521 (Colo. App. 2011) ("What constitutes a trade secret is a question of fact for the trial court." (citation omitted)). The Court must consider the following factors in determining the existence of a trade secret:

(1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, *i.e.*, by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*Hertz v. Luzenac Group*, 576 F.3d 1103, 1108 (10th Cir. 2009) (citation omitted).

Based on the record before the Court, the Court finds that genuine issues of material fact exist as to the first and third factors related to the status of the information claimed by Avedon as trade secrets.  The presented facts conflict regarding the extent to which certain of Avedon's customer lists, financial information, and trade show attendance were known outside of the business, and as to the precautions taken by Mr. Avedon to guard the secrecy of this information.[3]  For example, Plaintiffs contend that "[t]he customer list that was claimed as a trade secret was published on [Avedon's] website."  [#128] at 7.  However, the deposition testimony cited in support of this premise is inconclusive.  In his deposition, Mr. Avedon explained that Defendant Airius LLC "may have" published a "partial list" of its customers on its website, "up until December 2007."  [#130-1] at 14.  Thus, an issue of fact exists as to the protection of Avedon's customer lists postdating 2007.

Regarding the tradeshows, Mr. Canby confirmed that any visitor to Avedon's website would know which tradeshows the Avedon Defendants had attended or intended to attend.  *Canby Depo. Tr.*, [#128-10] at 5.  However, Mr. Canby's testimony concerned only the tradeshow list for 2008-2009, and Mr. Canby did not discuss the 2010 tradeshow list.

---

[3] A "customer list can be a trade secret when it is the end result of a long process of culling the relevant information from lengthy and diverse sources, even if the original sources are publicly available." *Hertz*, 576 F.3d at 1113 (citations omitted) (applying Colorado Uniform Trade Secret Act).  Further, under Colorado law, "information can be a trade secret notwithstanding the fact that some of its components are well-known." *Id.* at 1109 (citation omitted).

Thus, an issue of fact exists as to the protection of Avedon's tradeshow strategy postdating 2009.

Regarding Avedon's proprietary financial information, although the Court agrees with Plaintiffs that Avedon has not identified the allegedly protected financial information with specificity, the Court is concerned by the facts that Mr. Benton obtained Avedon's financial information pursuant to a confidentiality agreement and later disclosed it in the instant litigation, despite his obligation to destroy the documents after ending his business relationship with Avedon. *See Facts*, *supra* p. 11.  Construing these facts in the light most favorable to Avedon as the Court must,[4] and assuming that the financial information constitutes a trade secret, a reasonable jury could conclude that Mr. Benton possessed a valid trade secret, used or disclosed the trade secret without consent, and knew, or should have known, that the trade secret was acquired by improper means (*i.e.*, in violation of the confidentiality agreement), in satisfaction of the three elements of a misappropriation claim. Thus, summary judgment on this issue is not appropriate.   Therefore, the Court recommends that the Motion be denied as to Counterclaim Three, with the exception of Avedon's assertion of trade secret protection for the customer lists predating 2007 and the tradeshow lists predating 2009.

**D.    Unjust Enrichment Against All Plaintiffs and Third-Party Defendants (Counterclaim Eight)**

Although Plaintiffs and Mr. Cochran request summary judgment in their favor as to the Avedon Defendants' Counterclaim Eight, the parties present no factual or legal analysis

---

[4] *See Adler*, 144 F.3d at 670 (in applying summary judgment standard, the Court "view[s] the factual record and draw[s] all reasonable inferences therefrom most favorably to the nonmovant.").

in the Motion, Response, or Reply as to this counterclaim.   Therefore, the Court recommends that the Motion be denied as to Counterclaim Eight.

**E.   Violation of the CCPA Against All Plaintiffs and Third-Party Defendants (Counterclaim Nine)**

In Counterclaim Nine, the Avedon Defendants contend that the opposing parties made false and misleading statements about the Air Pear while marketing the Zoo Fan at tradeshows.  [#70] at 35.  Avedon claims that the opposing parties passed off the Air Pear as a Zoo Fan, and falsely portrayed the Zoo Fan as a functioning product.  *Id.*  Avedon asserts that this conduct constitutes a deceptive trade practice in violation of the CCPA, and that the conduct has harmed Avedon due to continued customer confusion.  *Id.*

Plaintiffs argue that Avedon cannot provide evidentiary support for the claimed deceptive practices, which consist of: "(1) making disparaging statements regarding the Air Pear's air flow capacity at a single trade show in Maryland in March 2010, (2) knocking off or passing off the products of Avedon in Zoo Fans' website, and (3) falsely depicting [on Zoo Fans' website] Zoo Fans' product as functioning, installed, and operating."  [#128] at 19.  Further, Plaintiffs assert that the public was not significantly impacted by the alleged improper conduct.  *Id.* at 20.

"A CCPA claim consists of five elements: (1) the defendant engaged in an unfair or deceptive trade practice; (2) in the course of its business; (3) significantly impacting the public as actual or potential consumers of the defendant's goods; (4) the plaintiff suffered an injury in fact to a legally protected interest; and (5) the practice caused the injury."  *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1120 (10th Cir. 2008) (citing *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146-47 (Colo. 2003)).  "Where the controlling facts are undisputed, the existence or lack of public impact

may be determined as a matter of law"; otherwise, such question "may be submitted to a jury as a trier of fact." *One Creative Place, LLC v. Jet Ctr. Partners, LLC*, 259 P.3d 1287, 1289 (Colo. App. 2011) (citations omitted). Further, "the determination of whether a certain act is deceptive or misleading for the purposes of [a] CCPA claim[ ] is a question of fact for the fact-finder." *Francis v. Mead Johnson & Co.*, No. 10-cv-00701-JLK, 2010 WL 5313540, at *4 (D. Colo. Dec. 17, 2010). Regarding the last element of a CCPA claim, "[t]he existence of a causal link between a defendant's conduct and a plaintiff's injury is a question of fact." *Hall v. Walter*, 969 P.2d 224, 237 (Colo. 1998).

The CCPA "cannot be used to remedy a purely private wrong." *Crowe v. Tull*, 126 P.3d 196, 208 (Colo. 2006). Avedon must show that the opposing parties' "unfair or deceptive practice significantly impacts the public as actual or potential consumers of [Avedon's] goods, services or property." *HealthOne of Denver, Inc. v. UnitedHealth Group Inc.*, 805 F. Supp. 2d 1115, 1121-22 (D. Colo. 2011) (citing *Rhino Linings USA*, 62 P.3d at 149). The public may be implicated by a deceptive practice if "the misrepresentations were directed to the market generally, taking the form of widespread advertisement and deception of actual and prospective purchasers." *Hall*, 969 P.2d at 235.

A proponent of a CCPA claim need not be a consumer. *NetQuote, Inc. v. Byrd*, 504 F. Supp. 2d 1126, 1135 n.5 (D. Colo. 2007) (citation omitted). Three factors guide the Court's adjudication of whether the challenged practice at issue impacts the public within the purpose and meaning of the CCPA: "(1) the number of consumers directly affected by the challenged practice, (2) the relative sophistication and bargaining power of the consumers affected by the challenged practice, and (3) evidence that the challenged practice has previously impacted the other consumers or has the significant potential to do

so in the future." *NetQuote*, 504 F. Supp. 2d at 1136 (citation omitted).

Here, the Court recommends finding that genuine issues of material fact exist as to whether the accused conduct constituted a deceptive trade practice, and whether it significantly impacted the public.[5]  The Colorado Supreme Court has recognized that the CCPA is a proper means of protecting the public from being "attracted to business concerns on the basis of statements falsely announcing the existence of products which are in fact non-existent." *People ex rel. Dunbar v. Gym of Amer., Inc.*, 493 P.2d 660, 667 (Colo. 1972).  Plaintiffs admit that the Zoo Fans product did not exist at the time of the tradeshows in dispute, and that the Zoo Fans product was represented as installed and functioning when in fact, it was neither. *See Facts*, *supra* p. 9-10.  Thus, a reasonable jury could find that the conduct at issue constituted a deceptive trade practice, and entry of summary judgment as to this counterclaim is not appropriate.

Regarding the question of public impact, the Court recommends finding that Ms. Helms' and Mr. Jones' Affidavits, as well as the presence of photo-shopped pictures on Zoo Fans' website and tradeshow booth, create a genuine issue of material fact as to whether the public was significantly impacted by the alleged deceptive trade practices. *See Facts*, *supra* p. 10.  On one hand, the Court recognizes that Ms. Helms and Mr. Jones represent a small number of sophisticated consumers. *See R.W. Beck, Inc. v. E3 Consulting, LLC*, 577 F.3d 1133, 1150 (10th Cir. 2009) (finding that the persons allegedly injured by the allegedly deceptive trade practices were sufficiently few in number, sophisticated, and armed with bargaining power, and thus did not constitute "the consuming public that the

---

[5]  Review of the briefing indicates that the remaining three elements of a CCPA claim (*i.e.*, whether Plaintiffs were engaged in the regular course of business, and whether Avedon suffered an injury in fact that was caused by the allegedly deceptive trade practices) do not appear to be disputed.

CCPA was designed to protect."). However, on the other hand, the simulated images were displayed on Zoo Fans' website, which could be found to constitute widespread advertisement of a non-existent product. *See Hall*, 969 P.2d at 235 (finding that alleged "deceptive practices implicated the public as consumers because the misrepresentations were directed to the market generally, taking the form of widespread advertisement and deception of actual and prospective purchasers"). Thus, the Court concludes that genuine issues of material fact exist as to Counterclaim Nine, and the Motion should be denied as to this counterclaim.

**F.    Unfair Competition Against All Plaintiffs and Third-Party Defendants (Counterclaim Ten)**

In Counterclaim Ten, the Avedon Defendants allege that the opposing parties have copied Avedon's "products or services" by "taking and using Avedon's design patent, proprietary information, and other property to start Zoo Fans without Avedon's permission." [#70] at 36. Avedon contends that as a result, the public is likely to be deceived or confused "because of the difficulties in distinguishing between Avedon's and Zoo Fan's products and services." *Id.* Avedon claims that such conduct has caused damage to Avedon in the form of "lost sales opportunities and profits." *Id.*

Plaintiffs argue that "there is no evidence that plaintiffs copied defendants' product and there is no evidence that plaintiffs' conduct has deceived or confused the public as to the source of the Zoo Fans business." [#70] at 22. The Court disagrees.

"The law of unfair competition has its roots in the common-law tort of deceit: its general concern is with protecting consumers from confusion as to source." *Bonito Boats v. Thunder Craft Boats*, 489 U.S. 141, 157 (1989). "Unfair competition is a question of fact and no inflexible rule can be stated as to what conduct will constitute unfair competition.

The universal test is whether the public is likely to be deceived." *NetQuote*, 504 F. Supp. 2d at 1130 (internal punctuation and italics omitted) (citing *Swart v. Mid-Continent Refrigerator Co.*, 360 P.2d 440, 442 (Colo. 1961)).   A claim of unfair competition may also include allegations of one party "palming off" another party's product as its own.   *See id.* at 1131.

Establishing the tort of unfair competition requires satisfaction of a two-part test.   *Id.* The Court must first evaluate whether the opposing parties have copied Avedon's "products or services or misappropriated [Avedon's] name or operations in some regard."   *Id.*  Next, the Court must determine whether such "conduct is likely to deceive or confuse the public because of the difficulties in distinguishing between [Avedon's and the opposing parties'] products and services."   *Id.*

Here, the Court recommends finding that a genuine issue of material fact exists as to whether the opposing parties copied Avedon's Air Pear, and as to whether such conduct is likely to deceive the public (and further, whether such conduct has already deceived the public).   As explained above, the Court recommends finding that a genuine issue of material fact exists as to whether Plaintiffs misappropriated Avedon's trade secrets, which satisfies the first part of the unfair competition evaluation for purposes of the instant Motion. *See supra* pp. 22-25.   Regarding the second part of the evaluation, the Court agrees with Avedon that the affidavits of Ms. Helms, Mr. Jones, and Mr. Hanna demonstrate that sophisticated consumers of the air destratification fan product experienced confusion as to whether the Zoo Fan was an Avedon product.   *Id.* at 9, 10.   Therefore, genuine issues of material fact exist as to this counterclaim, and the Court recommends that the Motion be denied as to Counterclaim Ten.

31

**G.     Design Patent Infringement Against All Plaintiffs and Third-Party Defendants (Counterclaim Twelve)**

The Avedon Defendants assert that the opposing parties "have engaged in the manufacture, use, distribution, marketing, and sale of a deceptively similar product" to the Air Pear.  [#70] at 37.  Avedon alleges that the Zoo Fan infringes the '688 Patent, because the Zoo Fan embodies "the patented design and columnar air movement" attributable to the Air Pear.  *Id.* at 38.  Avedon requests that the Court enjoin the opposing parties from further infringement and award Avedon compensation arising from "all gains, profits, advantages, and unjust enrichment derived from [the opposing parties'] violations of law." *Id.* at 38-39.

Plaintiffs move for summary judgment as to this counterclaim for two primary reasons.  First, Plaintiffs contend that Avedon has "no evidence that an ordinary observer would be deceived into believing the Zoo Fan is the same as the patented design."  [#128] at 24.  Second, Plaintiffs believe that the award of the '148 Patent, which includes the '688 Patent as prior art, weighs heavily in favor of a finding of non-infringement.  *Id.*  Plaintiffs additionally note that Avedon has not designated an expert in support of this counterclaim. *Id.* at 26.

In response, the Avedon Defendants include affidavits from Ms. Helms and Mr. Jones, who testify that they "mistakenly believed that Zoo Fans' product and design was actually Airius's."  [#142] at 32.  Avedon contends that this confusion is "not surprising," considering that Mr. Buell brought the Air Pear to Mr. Nelson and to Priority Designs as a model for the design of the Zoo Fan.  *Id.*

The Court applies patent law as stated by the United States Court of Appeals for the Federal Circuit when resolving patent disputes.  *Cf. Genetic Tech. Ltd. v. Agilent Tech.,*

*Inc.*, No. 11-cv-01389-WJM-KLM, 2012 WL 1060040, at *2 (D. Colo. Mar. 28, 2012) ("The Court must apply law from the Federal Circuit when evaluating certain jurisdictional issues in patent cases; however, 'in matters not unique to patent law,' the Court applies the law of the Tenth Circuit."). "Design patent infringement is a question of fact, which a patentee must prove by a preponderance of the evidence." *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1295 (Fed. Cir. 2010) (citation omitted).

To prevail on a claim asserting design patent infringement, "[t]he patentee must establish that an ordinary observer, familiar with the prior art designs, would be deceived into believing that the accused product is the same as the patented design." *Richardson*, 597 F.3d at 1295 (citation omitted).  The Court must evaluate whether any "deception that arises is a result of the similarities in the overall design, not of similarities in ornamental features in isolation." *Id.* (citation omitted).

"[T]he grant of a separate patent on the accused device does not automatically avoid infringement, either literal or by equivalency." *Nat'l Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1191 (Fed. Cir. 1996).  The fact that Plaintiffs obtained the '148 Patent which included the '688 Patent as prior art is relevant and should be accorded due weight, but it is not dispositive as to the question of whether the '148 Patent infringes the design of the '688 Patent.  *See Nat'l Presto Indus.*, 76 F.3d at 1192.

Here, the Court finds that although Plaintiffs allege an absence of evidence as to this counterclaim, the Avedon Defendants have presented sufficient evidence indicating that a reasonable jury could find in their favor.  *See Anderson*, 477 U.S. at 248 (summary judgment standard).  Ms. Helms' and Mr. Jones' Affidavits create a genuine issue of material fact as to whether an ordinary observer, familiar with the Air Pear, would be

33

deceived into believing that the Zoo Fan is the same as the patented design.  Moreover, as stated above, the existence of the '148 Patent is not dispositive, but may be weighed by the jury in making its determination.  Further, "expert evidence is not always necessary to resolve questions of patent infringement," thus Plaintiffs' argument regarding the absence of expert testimony as to this counterclaim does not sway the Court from its conclusion.  *Kyocera Wireless Co. v. President Elec., Ltd.*, 179 F. App'x 53, 54 (Fed. Cir. 2006) (citations omitted) (finding that expert evidence was not necessary in design patent infringement case concerning cell phone).  For these reasons, the Court concludes that genuine issues of material fact exist as to this counterclaim, and recommends that the Motion be denied as to Counterclaim Twelve.

## V.  Conclusion

Accordingly,

IT IS RESPECTFULLY **RECOMMENDED** that the Motion be **GRANTED IN PART** and **DENIED IN PART** as follows.  The Court recommends that the Motion be **DENIED** as to the Avedon Defendants' Counterclaims Three, Eight, Nine, Ten, Eleven, and Twelve. The Court recommends that the Motion be **GRANTED** as to the Avedon Defendants' Counterclaims One, Two, Six, and Seven.  The Court again notes that Plaintiffs and Mr. Cochran did not seek summary judgment as to the Avedon Defendants' Counterclaims Four and Five.

IT IS HEREBY **ORDERED** that pursuant to Fed. R. Civ. P. 72, the parties shall have fourteen (14) days after service of this Recommendation to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned.  A party's failure to serve and file specific, written objections waives de novo

review of the Recommendation by the District Judge, Fed. R. Civ. P. 72(b); *Thomas v. Arn*, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions. *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996).   A party's objections to this Recommendation must be both timely and specific to preserve an issue for de novo review by the District Court or for appellate review.  *United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated: August 15, 2012

BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge