IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 10-cv-01899-RBJ-KLM

JEFF BENTON, individually, and
ZOO FANS, INC., a Colorado corporation,

      Plaintiffs/Counterclaim Defendants,

v.

AVEDON ENGINEERING, INC., a Colorado corporation,
AIRIUS IP HOLDINGS, LLC, a Colorado limited liability company, and
AIRIUS, LLC, a Colorado limited liability company,

      Defendants/Counterclaim Plaintiffs

and

AVEDON ENGINEERING, INC., a Colorado corporation,
AIRIUS IP HOLDINGS, LLC, a Colorado limited liability company, and
AIRIUS, LLC, a Colorado limited liability company,

      Third Party Plaintiffs

v.

WILLIAM BUELL, JR., an individual,
HUNTERS GREEN MARKETING, INC., a Kentucky corporation, d/b/a BUELL AND
BEUELL and
CORY COCHRAN, an individual,

      Third-Party Defendants.

---

## ORDER

---

This case is before the Court on (1) plaintiff/counterclaim defendants' and third-party

defendants' Motion for Partial Summary Judgment [docket #128]; (2) the recommendation of a

magistrate judge that the motion be granted in part and denied in part [#161]; and (3)

plaintiff/counterclaim defendants' and third-party defendant's objection to the magistrate judge's order denying a motion in limine to preclude the testimony of David Hall [#164].

**FACTS**

Raymond B. Avedon invented the Airius Thermal Equalizer, later known as the Air Pear, which is a "destratification" device used to circulate air and equalize room temperatures in large buildings. In February 2006 he obtained a design patent (US Patent No. D514,688, referred to as "the '688 Patent"). He assigned the patent to Airius, LLC ("Airius"). In June 2008 he obtained a utility patent for the Air Pear (US Patent No. 7,381,129). Defendant Airius IP, formed on April 13, 2009, now owns the rights to the Air Pear patents and trademarks. Mr. Avedon owns all three companies that have been named as defendants in this case.

In January 2006 plaintiff Jeff Benton contacted Mr. Avedon about the possibility of investing in Airius. Mr. Benton promised that he would treat their discussions as confidential, and he signed a confidentiality agreement on January 27, 2006. They did not agree upon terms, and the negotiations ended in August 2007.

In July 2008 Mr. Avedon negotiated a marketing agreement with William F. Buell, owner of Hunters Green Marketing, Inc., whereunder Mr. Buell would devote full time to marketing Airius products. Mr. Buell signed a non-disclosure agreement concerning the protection and ultimately the destruction of confidential information provided to Buell.

In November 2008 negotiations between Mr. Benton and Mr. Avedon began again. In a letter agreement signed on February 4, 2009 Mr. Benton agreed to explore the formation of a new company to be owned by him and investors that would acquire Airius LLC. The parties agreed that Mr. Benton would prepare a business plan and attempt to locate investors in the Airius entities. In exchange Mr. Avedon gave Mr. Benton the exclusive right to negotiate with

potential investors for what amounted to a nine-month period. Mr. Avedon agreed to provide confidential, proprietary information regarding his companies to Mr. Benton, who in turn agreed to hold in in strict confidence. Agreement [#14-2] at 1-2. The February 4, 2009 agreement is sometimes referred to as the "exclusive dealing agreement."

This was followed by a non-disclosure agreement wherein Mr. Benton agreed not to disclose confidential information other to employees and advisors on a need to know basis and to destroy the confidential information when Benton's use of the information was finished or at Mr. Avedon's request. [#1-2].

Mr. Benton allegedly did not prepare a business plan, or invest in Airius, or introduce Mr. Avedon to other investors or purchasers, or make any good faith effort to find such investors. Instead defendants allege that, unbeknownst to Mr. Avedon, Mr. Benton and Mr. Buell were exploring opportunities for creating a business and product that would compete with Airius and Air Pear, and that they were taking advantage of Airius' confidential information to help them do so.

In October 2009 Mr. Benton notified Mr. Avedon that he no longer wished to continue their business relationship, and that he would identify and destroy the confidential information and files. In the same month Mr. Buell submitted a final invoice to Airius. In January 2010 Mr. Benton and others displayed a model of a destratification device at a trade show in Florida. In February 2010 Mr. Benton formally incorporated Zoo Fans, Inc. Beginning in October 2010 Zoo Fans, Inc. has been selling the Zoo Fan, a competing air destratification fan.

Defendants allege that Mr. Avedon learned of Zoo Fans and its product in first half of 2010. In July 2010 his attorney accused Mr. Benton of breaching the non-disclosure agreement. He likewise accused Mr. Benton, Mr. Buell, and two other individuals, Mike Johnson and Cory

Cochran, of stealing trade secrets. Calling the Zoo Fan a "rip off copy of my clients' designs," the letter demanded that Mr. Benton and the others cease the production and marketing of the Zoo Fan by August 1, 2010.

Mr. Benton and Zoo Fans, Inc. filed this action on August 9, 2010, essentially a preemptive strike, asserting five claims. The claims seek declaratory judgments that (1) Zoo Fans products do not infringe the '688 Patent; (2) Zoo Fans has not engaged in common law unfair competition; (3) Mr. Benton did not breach the non-disclosure Agreement; and (4) plaintiffs have not misappropriated trade secrets. Plaintiffs also assert that (5) defendants have violated the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), causing damages. In addition to the various declarations, plaintiffs seek treble damages, attorney's fees and costs.

Defendants answered, asserting various defenses [#70]. Defendants also counterclaimed and asserted third-party claims against Mr. Buell, his corporation and Mr. Cochran. The counterclaim and third-party claim assert theories of (1) fraud against Mr. Benton; (2) aiding and abetting fraud by Zoo Fans, Mr. Cochran and Mr. Buell; (3) misappropriation of trade secrets; (4) breach of the confidentiality agreements against Mr. Benton, Mr. Buell and Buell's corporation; (5) breach of the servicing agreements against Mr. Benton, Mr. Buell and Buell's corporation; (6) breach of fiduciary duty against ; (7) aiding and abetting breach of fiduciary duty against Zoo Fans and Mr. Cochran; (8) unjust enrichment and constructive trust against plaintiffs and third-party defendants; (9) violation of the Colorado Consumer Protection Act against plaintiffs and third-party defendants; (10) common law unfair competition against plaintiffs and third-party defendants; (11) civil conspiracy against plaintiffs and third-party defendants; and (12) design patent infringement against plaintiffs and third-party defendants.

4

The counterclaim and third-party claim seek damages, including treble damages, injunctive relief, attorney's fees and costs.

Not surprisingly this shotgun-style pleading (on both sides) has generated discovery issues and considerable motion practice.  As pertinent here, plaintiffs and the third-party defendants filed a 30-page motion for partial summary judgment [#128] supported by 16 exhibits (including 100 documents) in which they seek dismissal of ten of the 12 counterclaims. Actually, as they later acknowledged, they only mounted an attack on nine counterclaims (all but numbers 4, 5 and 8).  Not to be outdone, defendants responded with a 36-page brief [#142], supported by 40 exhibits (142 pages of documents).  Back came the plaintiffs with a 23-page reply [#154], mercifully supported by only one more exhibit.

The magistrate judge pulled all of this together in a 35-page order [#161] in which she recommended that the motion for partial summary judgment be granted as to counterclaims one, two, six and seven (fraud, fiduciary duty and related aiding and abetting of same) but otherwise denied.  Defendants promptly objected [#163], arguing in a mere 15 pages that the four counterclaims on which they did not prevail should remain alive and well.  The plaintiff group also objected [#165], providing 35 pages of explanation as to why not only should the four claims should remain dead, but that claims three, nine, ten, eleven and twelve should also be dismissed.  The objections generated their own responses [##166, 167].

While the motion for partial summary judgment was pending, the plaintiffs/third party defendants filed a motion in limine [#135], essentially a Daubert motion, seeking to preclude expert testimony from David Hall.  Following the filing of a response [#135] and a reply [#158] the magistrate judge denied the motion [#162].  That led to the plaintiff group's objection [#164] and defendant's response [#168].

## STANDARD OF REVIEW

Following the issuance of a magistrate judge's recommendation on a dispositive motion the district court must "determine *de novo* any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3). The district judge is permitted to "accept, reject, or modify the recommended disposition; receive further instruction; or return the matter to the magistrate with instructions." *Id.* To be proper, an objection must be both timely and specific. *U.S. v. One Parcel of Real Property*, 73 F.3d 1057, 1060 (10th Cir. 1996). An objection is timely if it is filed within fourteen days of the issuance of the Magistrate's recommendation. Fed. R. Civ. P. 72(b)(2). To preserve an issue for *de novo* review, the objection must be specific enough to "focus the district court's attention on the factual and legal issues that are truly in dispute." *One Parcel*, 73 F.3d at 1060. The Federal Magistrates Act does not "require any review at all, by either the district court or the court of appeals, of any issue that is not the subject of an objection." *Thomas v. Arn*, 474 U.S. 140, 149 (1985).

With respect to the portions of the Recommendation to which no objection was filed, "the district court may review a magistrate . . . [judge's] report under any standard it deems appropriate." *Summers v. Utah*, 927 F.2d 1165, 1167 (10th Cir. 1991) (citing *Thomas v. Arn*, 474 U.S. 140, 150 (1985) (stating that "[i]t does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings").

The Court may modify or set aside any part of a magistrate judge's orders on non-dispositive motions if it is clearly erroneous or contrary to law. Fed. R. Civ. P. 72(a).

## CONCLUSIONS

### Motion for Partial Summary Judgment [#128]

It is obvious from the parties' responses to the opposing parties' lists of supposedly "undisputed" facts that the case is replete with factual disputes. The question for present

purposes is whether these disputes are material to the various challenged claims.  Magistrate

Judge Mix did yeoman's work in attempting synthesize the squabble to a list of 37 facts that she

recommends be accepted as undisputed.  Recommendation [#161] at 6-11.  Plaintiffs accept the

list with various "clarifications."  Objection [#165] at 8.  Defendants do not dispute Judge Mix's

list.  To the extent that it is pertinent, the Court also accepts that list of undisputed or

undisputable facts.

   Fraud/Aiding and Abetting Fraud (claims one and two)

        Magistrate Judge Mix recommends that the Court dismiss these claims under the

"economic loss" rule.  That rule, created to maintain the boundary between contract and tort law,

provides that "a party suffering only economic loss from the breach of an express or implied

contractual duty may not assert a tort claim for such a breach absent an independent duty of care

under tort law."  *Town of Alma, Colorado v. Azco Construction, Inc.,* 10 P.3d 1256, 1264 (Colo.

2000).  Because she determined that the fraud counterclaim seeks the same relief as defendants'

fifth counterclaim, sounding in breach of contract, and that the duties complained of in both

counterclaims are identical, the magistrate judge concluded that the fraud claim does not arise

from a duty independent of the contract claim.  Recommendation [#161] at 16.

        The first counterclaim allege that, notwithstanding the exclusive dealing agreement, Mr.

Benton never had an intention to find investors.  Instead, he used the ruse of an exclusive dealing

arrangement to buy time while he, Mr. Cochran and Mr. Buell created Zoo Fans as a competing

company.  Avedon's Answer to First Amended Complaint and Avedon's Counterclaims and

Third-Party Complaint [#70] (hereafter "Avedon's Counterclaims") at ¶¶56-58.

        The fifth counterclaim, in pertinent part, asserts a breach of the exclusive dealing

agreement.  Defendants allege that Mr. Benton agreed to develop a business plan and to make a

good-faith effort to find potential investors but did not do either of these things. *Id.* at ¶¶91, 93-94. Defendants also allege that Mr. Benton intentionally tied Avedon up with this "exclusive dealing" agreement so that he could conspire with others to establish Zoo Fans as a competing business, thereby repeating the fraud allegation as part of the contract claim. *Id.* at ¶95.

On the face of these pleadings it is no wonder that the magistrate judge concluded that both claims arise from the same duties. Recommendation [#162] at 16. However, giving defendants the benefit of the doubt, which I do in the context of a motion for summary judgment, the two claims arise from different alleged duties. Despite defendants' unnecessary repetition of their fraud allegation in the fifth claim, the substance of that claim, as pertinent to Mr. Benton, is that he promised to prepare a business plan and to make an effort to find investors but did not do either of these things. His ulterior motive, if any, is essentially irrelevant. Regardless of the assortment of remedies that defendants loosely string together in their prayer for relief [#70 at 39-40], the remedy on the contract claim would be the benefit of the bargain, i.e., the value of a business plan and a good-faith effort to find investors.

The fraud claim is premised on the idea that contract was a means of gaining access to confidential information and buying time for Mr. Benton and his co-conspirators to create a competing business using the confidential information. The remedy would be the damages resulting from the creation of the competing business using defendants' confidential information, which is what the opinions of Mr. Hall, discussed below, appear to address.

I agree that fraud claims are not per se exempt from the economic loss rule. *Hamon Contractors, Inc. v. Carter & Burgess, Inc.,* 229 P.3d 282, 291-95 (Colo. App. 2009). However, the rule does not foreclose a fraud claim that is based upon a duty independent of the contract. *Town of Alma,* 10 P.3d at 1263 (citing *Brody v. Bock,* 897 P.2d 769, 776 (Colo. 1995)). Factors

to be considered are (1) whether the relief sought is the same, (2) whether there is a recognized common law duty, and (3) whether the tort duty differs from the contractual duty. *Hamon,* 229 P.3d at 293. As indicated, the relief appropriately sought is different. The tort duty asserted here is a combination of the classic duty not to make a promise with no intention of fulfilling the promise (fraud in the inducement) plus an intention to use the cover of a contractual relationship to gain access to confidential business information. As such, this duty differs from the contractual duty to create a business plan and seek investors in good faith.

For these reasons I do not adopt the recommendation to dismiss counts one and two.

Misappropriation of Trade Secrets (claim three)

The magistrate judge recommended that the Court decline to dismiss the misappropriation of trade secrets claim, because there are issues of fact material to this claim that are genuinely disputed. Recommendation [#161] at 25-26. The magistrate judge listed some examples of the fact disputes. I agree entirely. The magistrate judge noted that defendants may not have a viable claim that customer lists predating 2007 and tradeshow lists predating 2009 were protected as trade secrets. *Id.* at 26. The Court need not consider those details at this time. Suffice it to say that plaintiffs have not demonstrated the absence of a genuine dispute of fact material to this counterclaim.

Breach of Fiduciary Duty/Aiding and Abetting (claims six and seven)

Defendants allege that, in connection with the efforts to create a business plan and to locate potential investors, Mr. Benton, Mr. Buell and Hunters Green provided numerous promises and assurances of confidentiality. Avedon's Counterclaims [#70] at ¶102. Therefore, they were given access to defendants' trade secrets. *Id.* at ¶104. Because of this relationship Benton, Buell and Hunters Green had fiduciary duties to defendants, which they breached by

devising a scheme to steal defendants' design patent and other proprietary information to establish Zoo Fans as a competing business. *Id.* at ¶106.

The magistrate judge recommends that the Court grant summary judgment dismissing the breach of fiduciary duty claim because of the economic loss rule. I agree with the recommendation, although perhaps for a slightly different reason. The duties that allegedly created a fiduciary relationship are in substance the same as the contractual duties described in the fourth and fifth claims. As such, they did not create a fiduciary relationship or fiduciary duties independent of the contract. Defendants allege that the "secret competition" breached the fiduciary duties. However, that begs the question of whether there was a fiduciary relationship independent of the contractual duties in the first place. In my view the "secret competition" is more than amply addressed in the fraud, aiding and abetting fraud, misappropriation and civil conspiracy claims.

Unjust Enrichment (claim eight)

The magistrate judge recommended denial of the motion with respect to the unjust enrichment claim because plaintiffs presented no factual or legal support for the motion. Recommendation [#161] at 26. Plaintiffs now acknowledge that they mistakenly included the eighth claim in their motion for summary judgment. Objection [#165] at 10 n.2.

Colorado Consumer Protection Act (claim nine)

The magistrate judge recommended that the motion for summary judgment as to this claim be denied, because she found that there were genuine issues of material fact as to existence of deceptive trade practices and a significant public impact. Recommendation [#161] at 29. The claim, as it has evolved, is that (1) Mr. Benton and Mr. Cochran misrepresented at a trade show in January 2010 that its product existed, was installed and operating at various locations, and was

available for immediate purchase; (2) plaintiffs posted simulated photos of their non-existent product on the Zoo Fans website; (3) plaintiffs again misrepresented that they had an operating product ready to sell, deliver and install at an August 2010 tradeshow; but (4) in fact, Zoo Fans did not have an actual product to deliver until October 2010.  Avedon Response [#167] at 9.

These allegations are supported by the testimony of Mr. Cochran that he and Mr. Benton displayed a laser-cut model at a Florida trade show in January 2010 and received a very warm reception; Cochran Depo. [#149-1] at 4; an email authored by Mr. Benton on March 11, 2010 wherein Mr. Benton suggests that Ms. Helms "fell for the simulated photos;" [#142-34]; and the affidavit of Mark Hanna, concerning misrepresentations at the August 2010 trade show [#142-33].

Arguably this is enough to create a fact dispute as to the existence of a deceptive trade practice.  However, I cannot find that defendants have come forward with any evidence that arguably would satisfy the public impact requirement or that the alleged deceptive trade practices caused actual injury to the defendants.  The mere fact that displays at trade shows and on websites can be, and presumably are, viewed by numerous people is not enough.  There has to be some indication that there was a significant impact on the public.  There has to be some indication that these misleading representations of the existence and availability of the Zoo Fan actually caused defendants some harm.  Mr. Hanna's affidavit states that a Zoo Fans representative told him that they would take him to see installations on location but never did. [#142-33 at 3].  Ms. Helms states that she was confused by the similarities in design between the two products but does not indicate that misrepresenting simulated products as existing products caused confusion.  Neither of these affidavits tends to show that the misrepresentation of the

existence or availability of the Zoo Fan between January and October 2010 had any impact on them.

Although Colorado courts may have taken an "expansive approach" to Colorado Consumer Protection Act claims, as defendants argue – and particularly in the context of claims by actual consumers who have been deceived to their detriment, this makes good sense – I conclude that this claim does not do it. Defendants have not come forward with any evidence that creates a truly genuine issue of fact regarding the public impact or even the impact on the defendants of the representation that Zoo Fans had a marketable product a few months before it actually did.

Unfair Competition (claim ten)

The magistrate judge concluded, and the parties do not dispute, that common law unfair competition involves some act that deceives or confuses the public to the detriment of the public to the detriment of a competitor. *See generally NetQuote, Inc. v. Byrd,* 504 F.Supp. 2d 1126, 1130 (D. Colo. 2007). Wrongful appropriate by one competitor of the skill or labor of another can support an unfair competition claim. *University of Colorado Foundation v. American Cyanamid,* 880 F.Supp. 1387, 1404 (D. Colo. 1995). However, there must be some element of confusion or deception of the public. *Powell Products, Inc. v. Marks,* 948 F.Supp. 1469, 1475 (D. Colo. 1996).

As applied to the present case, defendants must show both that plaintiffs copied or otherwise appropriated Mr. Avedon's skill and labor and that the conduct deceived or confused the public because of the difficulties in distinguishing the Avedon product from the Zoo Fan product. *See NetQuote,* 504 F. Supp. at 1131. Defendants have produced evidence sufficient to withstand summary judgment on their misappropriation of trade secrets claim. They have

produced evidence in the form of the Helms and Jones affidavits sufficient to create a fact

dispute regarding confusion or deception of the public.  Therefore, I agree with the magistrate

judge that summary disposition is not appropriate.

Civil Conspiracy (claim eleven)

This claim is similar to the first and second claims (fraud, aiding and abetting fraud)

claims.  However, at least theoretically, it does not turn on an initial promise made with no

present intention to honor the promise.  Rather, and construing the counterclaim liberally in

defendants' favor for present purposes, defendants allege an agreement among two or more

persons (Benton, Buell, Hunters Green, Cochran) to accomplish an objective (to establish a

competing business) by means of at least one unlawful act (infringement of a design patent) with

resulting damages.  Viewing the claim in that manner, I agree with the magistrate judge that

there is a duty independent of the contractual duties, and that there are genuine issues of material

fact that preclude summary disposition.

Design Patent Infringement (claim twelve)

This claim, at least, is different from the other claims contained in defendants' shotgun-

style pleading.  The parties agree that design patent infringement occurs if an ordinary observer,

familiar with the prior art designs, would be deceived into believing that the accused product is

the same as the patented design.  *See, e.g., Crocs, Inc. v. Int'l Trade Comm'n,* 598 F.3d 1294,

1303 (Fed. Cir. 2010).  The focus is on deception resulting from similarities in the overall design.

*Richardson v. Stanley Works, Inc.,* 597 F.3d 1288, 1295 (Fed. Cir. 2010).

The magistrate judge, relying primarily on the affidavits of Marla Helms and Hugh Jones

[#142-33] found that defendants had presented sufficient evidence to raise a genuine issue of

material fact as to whether an ordinary observer familiar with the Air Pear would be deceived by

the overall design.  *See* Recommendation [#161] at 33-34.  Plaintiffs suggest that "[t]he record is devoid of any evidence that an ordinary observer would be deceived into believing that the Zoo Fan is the same as the patented design."  Objection [#165] at 31.  This is overstated to the point of losing credibility.  By any reasonably measure the Helms affidavit, and to a lesser extent the Jones affidavit, provide some evidence, as the magistrate judge and now this Court finds.

### Plaintiff/Counterclaim Defendants' and Third-Party Defendant's Objection to Magistrate Judge's Order Denying Motion in Limine to Preclude Testimony of Mr. Hall [#164]

The Court has reviewed the motion [#135], response [#153], reply [#158], magistrate judge order [#162], objection [#164] and response [#168].  In the course of doing so the Court has also reviewed Mr. Hall's report of November 28, 2011 [#136-1], excerpts from the Hall deposition [#136-2], his supplemental report of January 24, 2012 [#136-3], his affidavit [#153-1] and several of the cases relied upon by plaintiffs, including *Children's Broadcasting Corp. v. Walt Disney Co.,* 245 F.3d 1088 (8th Cir. 2000) and *02 Micro Intern, Ltd. v. Monolithic Power Systems, Inc.,* 399 F.Supp. 2d 1064 (N.D. Cal. 2005.

Plaintiffs argue that Mr. Hall relied upon unverified information.  Even if true, that argument goes to the credibility of the testimony, not its admissibility.  Rule 702 concerns the relevance (will the evidence be helpful to the jury; does it fit the facts of the case) and the reliability (is the witness qualified; has he based his opinions on sufficient facts and used reasonable methods) of the evidence.  *See Cartel Asset Management v. Ocwen Financial Corp.,* 2010 WL 3613819, at *2 (D. Colo. Sept. 7, 2010).  Plaintiffs mount no serious challenge to the relevance of the evidence.  Nor do they question Mr. Hall's qualifications.  As for the sufficiency of the facts and the reasonableness of the methodology, the Court finds the magistrate judge's

analysis, Order [#162] at 10-14, to be thoughtful and persuasive.  Mr. Hall's "unjust enrichment" method of calculating damages falls within the approaches to calculating damages in a misappropriation of trade secrets case that are recognized in Colorado.  C.R.S. 7-74-104(1).  *See Sonoco Products, Co. v. Johnson,* 23 P.3d 1287, 1289-90 (Colo. App. 2001).

The argument that Mr. Hall's damages opinions have not been linked or tailored to specific claims is likewise unavailing at this stage of the case.  Asserting multiple claims and theories has potential risks.  *See, e.g., Children's Broadcasting,* 245 F.3d at 1018-19.  *Cf. 02 Micro Intern,* 399 F. Supp. 2d at 1076 (damages dependent upon proving all of the 12 trade secrets allegedly stolen).  However, while this style of pleading may not be wise, it is not unprecedented in this type of case.  *See Sonoco,* 23 P.3d at 1288.  In any event, there is a significant difference between evaluating the testimony of a damages expert and the necessary causal link between damages and misconduct (which is the burden of the defendants, not the expert) in the context of the claims pursued and the evidence presented at trial, on the one hand, and precluding the expert's testimony in limine, on the other hand.

*Daubert* does not require exclusion of expert testimony just because the opposing party can find potential flaws in it.  As my colleague Judge Kane once wrote,

> A key but sometimes forgotten principle of Rule 702 and *Daubert* is that Rule 702, both before and after *Daubert,* was intended to relax traditional barriers to admission of expert opinion testimony.  Accordingly, courts are in agreement that Rule 702 mandates a liberal standard for the admissibility of expert testimony.  As the Advisory Committee to the 2000 amendments to Rule 702 noted with apparent approval, "[a] review of the caselaw after *Daubert* show that the rejection of expert testimony is the exception rather than the rule.

*Cook v. Rockwell Intern. Corp.,* 580 F. Supp. 2d 1071, 1082 (D. Colo. 2006) (citations omitted).

Finally, I note that plaintiffs requested a hearing on their motion, but the magistrate judge elected to decide the motion without a hearing.  Plaintiffs have not raised that issue in their "appeal," and therefore, I do not address it.

In sum, the Court cannot and does not find that the magistrate judge's order was either clearly erroneous or contrary to law.

**Order**

1. Motion #128 is GRANTED IN PART AND DENIED IN PART.  The Court grants the motion to the extent that defendants' sixth, seventh and ninth claims are dismissed.  The motion is otherwise denied.

2. Recommendation #161 is ACCEPTED AND ADOPTED IN PART.  The Court accepts the recommendation except with respect to the recommendations concerning the first, second and ninth counterclaims.

3. Objection #164 is DENIED.  Magistrate Judge Mix's order of August 15, 2012 [#162] is in all respects affirmed.

DATED this day 19th day of November, 2012.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge